SHARON KNIGHTS,                    )
as Administrator of the Estate of  )
Michael Lomec,                     )
                                   )
            Plaintiff,             )
                                   )        No. 12 C 09439
        v.                         )
                                   )        Judge Edmond E. Chang
UNITED STATES OF AMERICA,          )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

On December 15, 2009, Michael Lomec was walking on the street near an intersection in Chicago when he was struck by a car driven by David Forero, a Special Agent with the Federal Bureau of Investigation.[1] R. 1, Compl.[2] Lomec filed this Federal Tort Claims Act suit against the government. *Id.* Each party blames the other for the accident. Lomec claims that Forero acted negligently by failing to keep a proper lookout, by failing to slow down when approaching the intersection, by failing to see obviously visible things, and by failing to yield to Lomec. *Id.* ¶ 12. The government responds that Lomec has fallen short of his burden of proof, and in any event, it was Lomec who was negligent because he failed to exercise due care for his own safety when crossing the street. R. 7, Answer. After filing this case, Lomec passed away; his estate, which is administered by his sister, Sharon Knights,

---

[1]The Court has federal question jurisdiction over this Federal Tort Claims Act case under 28 U.S.C. §§ 1331, 1346(b)(1).

[2]Citations to the record are noted as "R." followed by the docket number and page or paragraph number.

was substituted as the Plaintiff. R. 86, 12/16/15 Minute Entry. On June 6, 2016, the Court held a one-day bench trial on the issue of liability only. (The parties agreed to split the liability and damages portions of the trial at a February 2016 status hearing. R. 87.) The Court has carefully considered all of the evidence, which comprised the trial testimony of Agent Forero and FBI Special Agent Keith Sam, Lomec's designated deposition testimony, the trial exhibits, and the stipulated facts. The Court now issues its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1). Ultimately, the Court finds that Forero and Lomec were both negligent and equally (50%) at fault for the accident.[3]

## I. Factual Background

### A. Evidence Offered at Trial

The following evidence was offered at trial, and is undisputed except where noted. The accident occurred on the afternoon of December 15, 2009, at the intersection of Lake Street and Francisco Avenue on the west side of Chicago, Illinois. R. 89, Parties' Proposed Pretrial Order at 2-3 (Stipulations 1 and 2). Francisco Avenue is a one-way northbound street. Lake Street consists of two lanes, one for each direction of traffic, and runs east-west. In that location, Lake Street sits directly underneath the Chicago Transit Authority "El" tracks. Def.'s Exh. 8; Pl.'s Exh. 1 (eastbound view of intersection); Pl.'s Exh. 2 (westbound view). Here are two photos of the intersection, the first looking east, the second looking west:

---

[3]To the extent that any factual findings are made in the Conclusions of Law section, that was done to better organize the Opinion for comprehensibility.





As the photos show, the "El" track beams straddle the two lanes and rest on the outer edge of both lanes. Def.'s Exh. 8; Pl.'s Exh. 1. Although Lake Street is only two lanes wide, the street extends several feet past the outer edges of those two

lanes to the north and south. Pl.'s Exh. 1; Pl.'s Exh. 2. This extended roadway is not covered by the "El" tracks and is wide enough for cars to drive and park on. Pl.'s Exh. 1; Pl.'s Exh. 2. There are no traffic signals or signs on Lake Street at this intersection. Pl.'s Exh. 1; Pl.'s Exh. 2. Nor is there a marked crosswalk on the west side of the intersection across Lake Street. Pl.'s Exh. 1; Def.'s Exh. 8.

On the day of the accident, Lomec had taken the "El" train to the California stop, which is located at the intersection of Lake Street and California Avenue (two blocks east of the accident site). Lomec Dep. 23:10-19, 24:1-5, 24:16-17. Lomec was headed to "Al's Chicken" for lunch, which is located just west of the Lake and Francisco intersection on Lake Street, and then to a doctor's appointment. *Id.* 22:24-25, 23:1-4, 23:12-17, 33:10-19. It was a clear day and visibility was good. Def.'s Exh. 2, 12/16/09 Federal Motor Vehicle Accident Report at 2. After leaving the train station, Lomec began walking west on Lake Street. Lomec Dep. 23:20-23, 24:6-9, 24:18-20, 25:14-19. He soon reached the intersection of Lake and Francisco. *Id.* 25:14-19. Lomec crossed Francisco Avenue, which placed him on the southwest corner of the intersection. *Id.* 25:14-19, 27:1-5. At the same time, Forero was driving east on Lake Street; according to Forero, he was driving at about 15 to 20 m.p.h. (about five to ten miles-per-hour below the 25 m.p.h. speed limit). R. 110, Trial Tr. (Morning) 47:20-48:12. Forero was on duty and headed to a specific location in the city to conduct surveillance. *Id.* 34:11-35:23; Parties' Proposed Pretrial Order at 3 (Stipulations 3 and 4). Forero testified that he was being "hypervigilant" and

scanning the roadway at the time, Trial Tr. (Morning) 48:13-49:1, though Lomec of course argues that Forero was not paying enough attention.

At around 2:48 p.m., Lomec started to walk northbound across Lake Street. Parties' Proposed Pretrial Order at 3 (Stipulation 2); Lomec Dep. 25:14-19, 27:18-23, 28:13-17. He claims he looked both ways for oncoming traffic, but did not see any cars. Lomec Dep. 27:24-25, 28:1-9, 29:1-6, 30:18-20. According to Lomec, he then took several steps (somewhere between five and eight) into the intersection. *Id.* 28:11-25. Forero argues that Lomec did not cross at the intersection, and in fact walked into Forero's car. At Lomec's deposition, Lomec testified that he had just passed one of the "El" beams and was stepping forward with his right foot into the eastbound traffic lane when he collided with Forero. *Id.* 28:13-25, 31:1-8; Pl.'s Exh. 1 (photo with "X" marking where Lomec contends accident occurred). Lomec testified that Forero's tire rolled over Lomec's right foot, causing Lomec to fall to the ground. Lomec Dep. 31:1-8. Lomec's face, chest, and hands all hit the ground, and Lomec landed about five to six feet away. *Id.* Forero did not see Lomec before or during the collision. The first time Forero saw Lomec was after the collision, when Lomec was already on the ground. Trial Tr. (Morning) 42:13-22, 51:15-52:1.

After the accident, Forero immediately pulled over, got out, and checked on Lomec. *Id.* 52:6-53:15. Forero did not see any blood, did not notice Lomec hobbling, and did not find Lomec to be impaired in any way. *Id.* 56:5-12. Forero asked Lomec if he needed any medical treatment. *Id.* 53:9-15. Lomec said he was fine. *Id.* 57:3-9; Lomec Dep. 34:17-25. Forero never identified himself as an F.B.I. agent, but Forero

did tell Lomec that he would need to report the accident because he was driving a company car. Lomec Dep. 35:5-9; Trial Tr. (Morning) 56:13-21, 57:25-58:2. Forero then asked Lomec for some identifying information. According to Forero, Lomec was initially hesitant to share any information with Forero, but after several minutes of "cajoling," agreed to do so. Trial Tr. (Morning) 57:10-13, 60:20-25. (Lomec did not mention any hesitancy on his part related to exchanging information, *see generally* Lomec Dep., but he was not directly asked during the deposition.) Forero gathered the following information from Lomec: Lomec's name, address, date-of-birth, two telephone numbers, and identification card number. Forero wrote this information down on a piece of paper at the accident site, along with the date ("12/15/09"), time ("2:48 pm"), intersection ("Lake/Francisco"), and make, model, and license plate number of his vehicle ("231 6642 Ford Taurus")[4]. Def.'s Exh. 6, Forero Handwritten Note; Trial Tr. (Morning) 62:7-64:24. Lomec then left on foot. Forero testified that throughout his interactions with Lomec, Lomec was both polite and cordial. Trial Tr. (Morning) 67:2-13.

After Lomec left, Forero moved his car onto Francisco Avenue and called his squad secretary, Peg Kelley, to let her know that he had been in an accident. Trial Tr. (Morning) 70:1-8; Pl.'s Exh. 4, Nextel Invoice at 1. Forero made this call at 2:52 p.m.[5], around four minutes after the accident supposedly occurred. Trial Tr. (Morning) 70:9-71:19. The call lasted for three minutes and nine seconds. Nextel

---

[4]Forero testified that he may have written down his car information after leaving the accident site. Trial Tr. (Morning) 61:8-63:6. But the timing of this is not important.

[5]The government stipulated at trial that the call to Peg Kelley occurred at 2:52 p.m., even though the Nextel invoice lists the date and time of this call as "2009-12-15 20:52:10." Pl.'s Exh. 4, Nextel Invoice at 1; Trial Tr. (Morning) 70:22-71:3.

Invoice at 1. Forero then took five photographs of the accident site, including two photographs of the intersection, one of what appears to be the unmarked crosswalk, and two of his car. Def.'s Exh. 5, Five Photographs of Scene; Trial Tr. (Morning) 79:7-15; R. 111, Trial Tr. (Afternoon) 109:18-111:4. The only visible damage to Forero's car was to the right side mirror, which can be seen dangling down in two of the photographs. Five Photographs of Scene at 3, 5; Trial Tr. (Afternoon) 110:22-111:4. Forero stated that he took these photographs to have some evidence of the location of the accident. Trial Tr. (Morning) 80:13-16.

Forero then left the accident site and went to the police station. Trial Tr. (Morning) 81:11-13. He spoke to an on-duty officer and told the officer about the accident, *id.* 82:1-3; that officer then prepared an Illinois Traffic Crash Report. Pl.'s Exh. 18, 12/15/09 Illinois Traffic Crash Report. Forero was familiar with these crash reports from his time with the Chicago Police Department. Before becoming an F.B.I. agent, Forero served as a Chicago Police Officer for six years (from 1998 to 2004). Trial Tr. (Morning) 27:24-28:3, 29:20-25. Forero estimated that, when he was a police officer, he probably filled out around 50 to 100 of these traffic reports. *Id.* 28:24-29:5. He also knew that it was important to be as accurate as possible in these reports. *Id.* 30:10-14. This December 15 report—the date of the accident—lists the accident site as "2900 W Lake," which corresponds to the intersection (as opposed to an address west of the intersection). 12/15/09 Illinois Traffic Crash Report. Forero could not remember exactly what he told the officer about the location of the accident. Trial Tr. (Morning) 84:13-19, 87:12-13. The report describes the accident

as follows: "Unit #2 (pedestrian) walked into street and was struck by Unit #1. No injuries reported. Pedestrian refused any service by driver of Unit #1." 12/15/09 Illinois Traffic Crash Report.

The next day, Forero updated his handwritten note from the day of the accident to include the following additional information: that Lomec "refused medical treatment," that Lomec "said [he] was late for work," that he "[d]id not want to wait," and that he "wasn't going to sue/hoped I [Forero] would not sue him." Def.'s Exh. 6, Forero Handwritten Note; Trial Tr. (Morning) 65:1-66:8. That same day, Forero also personally filled out three reports: (1) an Illinois Motorist Report, Def.'s Exh. 1, 12/16/09 Illinois Motorist Report, (2) a motor vehicle accident report, Def.'s Exh. 2, 12/16/09 Federal Motor Vehicle Accident Report, and (3) an internal F.B.I. Report, Def.'s Exh. 3, 12/16/09 F.B.I. Report; Def.'s Exh. 4 (copy of the same report). *See also* Trial Tr. (Morning) 88:13-16, 99:25-100:24. In the Illinois Motorist Report, Forero described the accident as follows:

> Unit 1 [Forero], East Bound Lake Street, struck Pedestrian who was walking North Bound from approximately 2903 West (Lake St). Pedestrian was standing beside/near an "L-Train" support beam/column. As Unit 1 drove past "L-Train" support beam, Pedestrian stepped into roadway. Unit 1 passenger side mirror struck pedestrian. Pedestrian stated he was fine, was offered medical treatment/ambulance – refused. Pedestrian left on foot after exchanging identifying information with Unit 1 driver.

Def.'s Exh. 1, 12/16/09 Illinois Motorist Report at 2. Forero drew a diagram depicting this information as well. *Id.* This report, unlike the Illinois Traffic Crash Report from the day before, lists the accident address as "2903 West (Lake St)," a location slightly west of the Lake and Francisco intersection, as opposed to "2900 West Lake," which falls right at the intersection.

Forero's motor vehicle accident report includes a similar description and diagram. Def.'s Exh. 2, 12/16/09 Federal Motor Vehicle Accident Report. In that report, Forero wrote:

> FED was east bound Lake Street, travelling approximately 15 to 20 mph. Unknown posted speed limit. Road conditions normal. Weather – normal. Driver visibility – the "L-Train" support beam partially obstructed view of Pedestrian. Condition of light – daylight. No traffic control signal or stop sign observed at intersection of Lake/Francisco. Pedestrian was walking north bound from approximately 2903 W. Lake Street (not crosswalk). Pedestrian was standing near/besides an "L-Train" support beam. As FED drove past "L-Train" support beam, Pedestrian stepped into the roadway. FED's passenger side mirror struck Pedestrian.

*Id.* at 2.

Forero's internal F.B.I. report contained more detail of the accident from his perspective. In that report, Forero describes the accident as follows:

> On 12/15/2009, at approximately 2:48 p.m., SA Forero was traveling eastbound (approximately 15 to 20 mph) on the 2900 block of West Lake Street in Bureau Vehicle CG-358, a 2005 Ford Taurus, when he struck a pedestrian who was walking northbound from approximately 2903 West Lake Street. The pedestrian was standing beside/near an "L-Train" support beam. The pedestrian was struck by CG-358 passenger side mirror as pedestrian stepped into the roadway. The pedestrian was not on the crosswalk. The pedestrian was identified as Michael J. Lomec.
>
> Immediately after the collision, SA Forero stopped the vehicle and checked on the well being of Lomec. SA Forero observed Lomec laying on the ground. SA Forero helped Lomec to his feet. No bleeding or visible injuries were observed. SA Forero asked Lomec if he was okay. Lomec replied he was okay. … SA Forero then offered to contact the Chicago Police Department to report this accident. Lomec again stated that he was fine, he did not want to wait, and that he was late for work. SA Forero and Lomec exchanged identifying information. As we exchanged information, Lomec stated something to the effect of, "don't worry, I'm not gonna sue you, I hope you don't sue me for walking into your car." … After exchanging personal information, SA Forero observed Lomec walking north bound Francisco Avenue from Lake Street, Chicago.

Def.'s Exh. 3, 12/16/09 F.B.I. Report at 1-2.

In addition to the testimony and exhibits discussed above, the government also elicited testimony from F.B.I. Special Agent Keith Sam, one of Forero's colleagues. Sam first learned of the accident shortly after it happened, when he received a phone call from Forero. Trial Tr. (Afternoon) 144:6-9. Sam stated that, the day after the accident, Forero asked him to return a call he received from Lomec.[6] *Id.* 145:7-10. It was during Sam's conversation with Lomec that Lomec first learned Forero was an F.B.I. agent. 12/16/09 F.B.I. Report at 2. According to Sam, on that call, he provided Lomec with the police report number and bar code related to the incident. Trial Tr. (Afternoon) 146:7-12. After the call ended, Sam shared all of the information he learned on that call with Forero. *Id.* 146:14-16. It appears Forero then documented the information in his internal F.B.I. Report, noting the following (among other things) about Sam's call:

> On 12/16/2009 SA Keith Sam contacted Lomec telephonically[.] … During the conversation Lomec stated that he obviously wasn't looking either when it (accident) happened and that he was on way to buy some chicken to eat for lunch. Lomec advised he has a broken ankle and 'something else going on' (did not specify). Lomec advised that Dave (SA Forero) was very nice and concerned for his well being. Lomec stated he was unaware that Forero was an FBI employee.

Def.'s Exh. 3, 12/16/09 F.B.I. Report at 2; *see also* Trial Tr. (Afternoon) 150:18-21.

Finally, the Court allowed the government to introduce into evidence some of Lomec's medical records from Hines VA Hospital and Jesse Brown VA Hospital. Def.'s Exhs. 10-21, 26-27. These records contain physician and medical staff notes

---

[6]Lomec testified that Sam called him a couple weeks after the incident. Lomec Dep. 35:11-21. When asked whether he remembered having a conversation with Sam the day after the accident, Lomec responded, "No. I may have. I may not have. I don't remember." *Id.* 36:13-18. The timing of the call is not really important.

discussing Lomec's prior drug use and his mental health in the days following the accident. The records include a drug test from two days after the accident, which showed detectable traces of cocaine and opiates in Lomec's system. Def.'s Exh. 12, 12/17/09 Drug Test Results. The records also state that Lomec suffered from "[c]ocaine abuse," "[a]lcohol abuse," "[p]olysubstance dependence," and "prescription narcotic abuse." *E.g.*, Def.'s Exh. 11 at 4 (Hines VA – 000895; 12/17/09 Emergency Department Triage Note); *id.* at 24 (Hines VA – 000915; 12/17/09 Physician Emergency Dept E&M Note); Def.'s Exh. 13 at 3 (Hines VA – 000884; 12/17/09 Suicide Risk Assessment Note). They also show that three days after the accident, Lomec admitted to "currently using cocaine 3-4x per month" and to "relaps[ing] several weeks ago." Def.'s Exh. 15 at 2 (Hines VA – 000856; 12/18/09 Mental Health Treatment Plan Note); *see also* Def.'s Exh. 20 at 2 (Hines VA – 000848; 12/19/09 Social Work Initial Evaluation Note) ("[Patient] also abusing cocaine and alcohol regularly").

The medical records are also littered with comments about Lomec's mental health, including that he was having "suicidal ideations" in the days immediately following the accident. *E.g.*, Def.'s Exh. 10 at 1 (Hines VA – 000922; 12/17/09 Mental Health Nursing Note) ("[Patient] came to Hines VA due to having suicide ideations with plan of overdosing on drugs."); Def.'s Exh. 15 at 1 (Hines VA – 000855; 12/18/09 Mental Health Treatment Plan Note) ("[Patient is] currently endorsing depressive symptoms and strong suicidal ideations."). One of the records says that Lomec's "[c]urrent suicidal ideations began intermittently for the last few weeks,"

and that "in the last 3 days [December 15, 2009 through December 18, 2009] [Lomec] has been 'constantly' thinking about it." Def.'s Exh. 15 at 6 (Hines VA – 000860; 12/18/09 MH Medical Student Note). Several notes also identify Lomec as being depressed. *E.g.*, Def.'s Exh. 14 at 1 (Hines VA – 000887; 12/17/09 H & P Note) (patient complaining of "worsening depressive symptoms"); Def.'s Exh. 20 at 6 (Hines VA – 000852; 12/19/09 Social Work Initial Evaluation Note) ("MOOD: Depressed"). A mental health note from two days after the accident identifies Lomec as being "easily distracted," having "racing thoughts," and "poor concentration." Def.'s Exh. 14 at 1 (Hines VA – 000887; 12/17/09 H & P Note). Others identify Lomec as having "[p]oor judgment." Def.'s Exh. 20 at 6-7 (Hines VA – 000853-854; 12/19/09 Social Work Initial Evaluation Note); Def.'s Exh. 10 at 2 (Hines VA – 000922; 12/17/09 Mental Health Nursing Note) ("judgment/insight -- poor"). Several of the notes also describe Lomec's suicidal thoughts as stemming from "increased medical problems, pain, cocaine use, and inability to see son." Def.'s Exh. 15 at 1 (Hines VA – 000855; 12/18/09 Mental Health Treatment Plan Note); Def.'s Exh. 20 at 2 (Hines VA – 000848; 12/19/09 Social Work Initial Evaluation Note). None of the records in the days immediately following the accident describe Lomec as having suicidal thoughts related to stepping in front of traffic, however. *See* Def.'s Exh. 10 at 1 (12/17/09 Mental Health Nursing Note) ("suicide ideations with plan of overdosing on drugs"); Def.'s Exh. 14 at 1 (Hines VA – 000887; 12/17/09 H & P Note) ("[Patient] stated to author that if he went home tonight he would most likely attempt to kill himself using either a knife on his arms or a gun he owns"); Def.'s

Exh. 15 at 6 (Hines VA – 000860; 12/18/09 MH Medical Student Note) ("[Patient] admits to desiring slitting his wrist … "); Def.'s Exh. 20 at 7 (Hines VA – 000853; 12/19/09 Social Work Initial Evaluation Note) ("admitted for suicidal ideation with plan to cut wrist"). Statements to that effect are not seen until nearly a year after the accident occurred. Def.'s Exh. 23 at 3 (Hines VA – 00753; 03/17/10 Social Work E & M Note) ("[Patient] had thoughts of jumping onto the freeway since he felt hopeless about his ability to stop using drugs."); Def.'s Exh. 27 at 2 (Jesse Brown VA – 000416; 11/02/11 Discharge Summary) ("presents with worsening mood and suicidal ideation with plan to jump into traffic").

At trial, the government relied on these records to argue that Lomec's mental state was clearly disrupted at the time of the accident and that Lomec could not have been exercising a reasonable degree of care when crossing the street. Lomec, for his part, testified that he was not under the influence of any drugs or alcohol at the time of the accident. Lomec Dep. 32:14-23 ("Q. … [W]ere you under the influence of any drugs? / A. No. / Q. Had you drank any alcohol in the 48 hours prior to this accident? / A. Absolutely not. / Q. Had you consumed any drugs, prescription or otherwise, in the 48 hours before this happened? / A. No.").

## B. Findings of Fact

While the parties agree that the accident occurred near the intersection of Lake Street and Francisco Avenue, they disagree on the precise location. Forero asserts that the accident occurred several feet west of the intersection, Pl.'s Exh. 1 (photograph of intersection; circle mark indicates where Forero states he first saw

Lomec, who was lying on the ground), whereas Lomec asserts that it occurred at the intersection, *id.* ("X" mark indicates where Lomec contends the accident occurred); Lomec Dep. 27:10-17. For convenience's sake, here is Exhibit 1 again, which shows the dueling locations:



On consideration of the evidence, the Court credits Lomec's version and finds that Lomec has proven, by a preponderance of the evidence, that he was in the intersection at the time of the collision. In addition to Lomec's own testimony, there is other evidence to support this finding. First, it would be natural for Lomec—and any other pedestrian trying to get across Lake Street—to cross specifically at the intersection itself. On both sides of the intersection, the sidewalk ramps downward with raised bumps alerting pedestrians that they are approaching the street. These ramps can be seen in the photos of the intersection, Pl.'s Exh. 1, Def.'s Exh. 5 (second photo), and indeed Lomec testified about them too, Lomec Dep. 30:14-17.

Under Illinois law, the path from sidewalk-to-sidewalk is deemed to be a crosswalk, where pedestrians have the right of way, even though the crosswalk is not marked with painted lines. 625 ILCS 5/1-113(b). This legal principle is discussed more in the Conclusions of Law section; for now, there is also a *fact*-finding purpose to the fact that there is a crosswalk there—the ramps are obvious invitations to cross at the intersection, and thus the crosswalk offers some modest evidentiary support that pedestrians would naturally use that intersection to cross.

Another set of facts supporting this finding is that Forero's day-of statements put the location of the accident at the intersection. Forero's handwritten note from December 15 says, "Lake/Francisco." Def.'s Exh. 6. And right after the accident, Forero went to a nearby Chicago police station to report the accident; the Illinois Traffic Crash Report generated from Forero's interview at the station puts the accident at 2900 W. Lake, which is the intersection. Pl.'s Exh. 18, 12/15/09 Illinois Traffic Crash Report. Although Forero does not remember precisely what he told the officer, he conceded at trial that he apparently told the officer that the accident happened at 2900 West Lake (or the intersection of Lake and Francisco) because that was what the Traffic Crash Report stated. Trial Tr. (Morning) 87:12-13. Forero understood the importance of accuracy in these crash reports, because he himself had filled out more than 50 of them when he served as a Chicago Police Officer before joining the FBI. *Id.* 28:24-29:5. So, in contrast to Forero's day-*after* statements, the day-*of* statements put the accident at the intersection itself. The Court hastens to add that it is *not* finding that, after the day of the accident, Forero

intentionally misstated where the accident happened. Forero did not see Lomec before the collision, so Forero really was making his best guess as to where the accident happened, and he was simply mistaken that Lomec had fallen down west of the intersection. The mistake is an innocent one: quite naturally, neither Forero nor Lomec took a picture or otherwise tried to visually record precisely where Lomec had fallen in the immediate aftermath of the accident.

The government, for its part, argues that the injuries that Lomec sustained are inconsistent with him being in the crosswalk at the time of the collision. The government asserts that the only way Lomec's right foot and ankle could have been injured in the collision is if Lomec was crossing Lake Street from the south to the north on a westbound *angle*. But there is no particular reason why this would be so. During his deposition, Lomec explained how the accident occurred. He stated that he was hit by Forero's car as he was taking a step forward with his right foot. Lomec Dep. 31:1-23. According to Lomec, this caused the car to roll over his right foot, which in turn caused Lomec to fall to the ground. *Id.* That is a perfectly plausible description of the accident and the injury. More likely than not, the crosswalk is where the accident happened.

Making a finding as to the location of the accident still leaves open the ultimate question: how did the accident happen? On consideration of all the evidence, the Court finds that the accident could not have happened exactly how *either* Lomec *or* Forero say it happened. Both say they were paying attention: Lomec testified that he did look for traffic before crossing, and saw no cars. Forero likewise

testified that he was closely watching out for pedestrians, and saw no one. But based on the clear visibility conditions on the street and the configuration of Lake Street, *if* Lomec and Forero really had been paying attention, then they would have seen each other before the accident. It was daytime and not raining; nothing about the weather blocked Lomec's or Forero's view. Def.'s Exh. 2, 12/16/09 Federal Motor Vehicle Accident Report at 2. There were no parked cars on Lake anywhere near (or even distant from) the intersection, so no other traffic blocked Lomec's or Forero's view. Forero argues that one of the El track beams on Lake Street must have concealed Lomec. But the physical layout of the street and the El beams refute this argument. Even if an El track beam did block Lomec from Forero's view for a brief moment, the beams are not wide enough to have blocked Lomec from Forero's view for the entirety of Forero's approach to the intersection. *See* Pl.'s Exh. 1 (photograph of intersection). Indeed, Lomec had to cross several feet of roadway just to reach Lake Street's two primary traffic lanes, *id.*, which both sides agree is where the accident occurred. And Lake Street is even wider than the usual city street, because it is wide enough to allow cars to drive and park on both sides of the street. *Id.* So Lomec had to take at least five to eight steps before he was hit. *Id.*; Lomec Dep. 28:11-25. Given Lomec's larger stature, the size of the El track beams, and the fact that Lomec was walking just before the accident, it is simply not credible that one of the El track beams blocked Forero's view of Lomec. *See* Pl.'s Exh. 1; Def.'s Exh. 7. All in all, nothing blocked Lomec's or Forero's view, so the only way the accident

happened is that both of them did not pay attention when entering the intersection.[7]

## II. Conclusions of Law

Lomec seeks relief under the Federal Tort Claims Act, 28 U.S.C. § 2674, for Forero's alleged negligence in hitting him. R. 1, Compl. The Federal Tort Claims Act "is a limited waiver of the United States' sovereign immunity." *Luna v. United States*, 454 F.3d 631, 634 (7th Cir. 2006). It renders the federal government liable for those acts or omissions of its employees that would be unintentional torts in the state in which they occurred had they been committed by someone other than a federal employee. *Id.*; *Richards v. United States*, 369 U.S. 1, 6 (1962); 28 U.S.C. §§ 1346(b)(1), 2674. *See also Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013) ("In the FTCA, … Congress waived the United States's sovereign immunity for suits brought by persons injured by the negligence of federal employees acting within the scope of their employment."). An action brought under the Federal Tort

---

[7]Lomec offered evidence in an attempt to show that Forero was on a phone call when the accident happened, which would have distracted Forero. Forero's phone records show that "Push to Talk" calls were made on Forero's phone (it is unclear whether Forero made the calls or simply received them) at 2:31 p.m., 2:38 p.m., and 2:42 p.m. Pl.'s Exh. 4, Nextel Invoice at 5. (The Push-to-Talk feature allows a user to listen to other users who are also connected to the same channel without pushing any buttons, and to talk directly to other users by holding down a button—similar to a walkie-talkie.) Forero placed the time of the accident at 2:48 p.m., Def.'s Exh. 6, Forero Handwritten Note, and Lomec points out that this is just four minutes before Forero made a call to his squad secretary to report the accident, Pl.'s Exh. 4, Nextel Invoice at 1. According to Lomec, 2:48 p.m. could not possibly be the time of the accident because Forero testified that after he hit Lomec, he pulled over, got out, checked to see if Lomec needed medical assistance, and spent several minutes "cajoling" Lomec's personal information out of him. Although 2:48 p.m. might be a little too late relative to the call to the squad secretary, Forero could have done all the things he said within 10 minutes, and he thus would not have been on the phone at the time of the accident. The Court concludes that the evidence falls short of showing that Forero was on his phone at the time of the accident.

Claims Act is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Luna*, 454 F.3d at 634. In this case, the collision occurred in Illinois, so Illinois law governs.

Under Illinois law, Lomec may recover if he can show (1) the government, through Forero, owed him a duty, (2) Forero breached that duty, and (3) Forero's breach was the proximate cause of his injuries. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999); *Barnett v. Ludwig and Co.*, 960 N.E.2d 722, 730 (Ill. App. Ct. 2011); *Furry*, 712 F.3d at 992. Lomec must prove each of these elements by a preponderance of the evidence. *Nolan v. Weil-McLain*, 910 N.E.2d 549, 562 (Ill. 2009); *Leonardi v. Loyola Univ. of Chi.*, 658 N.E.2d 450, 455 (Ill. 1995). If Forero acted negligently, then the Court must also consider whether Lomec acted negligently, because Illinois limits a plaintiff's recovery in the event he or she is contributorily negligent. 735 ILCS 5/2-1116(c). If Lomec is partially responsible for causing this accident, then any damage award he may receive must be reduced in proportion to the percentage of fault attributable to him. *Id.* If Lomec is more than 50 percent at fault for the accident, then he cannot recover anything, even if Forero was also negligent. *Id.*; *Powell v. Dean Foods Co.*, 7 N.E.3d 675, 708-09 (Ill. App. Ct. 2013); *Country Mut. Ins. Co. v. Sunbeam Prods., Inc.*, 500 F. Supp. 2d 986, 989 (N.D. Ill. 2007).

Lomec asserts that Forero acted negligently when he struck Lomec with his car, because Forero failed to reduce his speed as he approached an intersection, failed to keep a proper lookout, failed to see obviously visible things, and failed to

yield to a pedestrian. Compl. ¶¶ 7-14. Neither side disputes that under Illinois law, drivers have a duty to maintain a proper lookout for pedestrians and a duty to use ordinary care when operating a motor vehicle so as to avoid injuring a pedestrian. *Mulloy v. Am. Eagle Airlines, Inc.*, 832 N.E.2d 205, 211 (Ill. App. Ct. 2005) ("The operator of a motor vehicle has the duty to use ordinary care to avoid injuring a pedestrian."); *Alexander v. Yellow Cab Co.*, 609 N.E.2d 921, 924 (Ill. App. Ct. 1993) ("Anyone driving a motor vehicle anywhere has a duty to maintain a proper lookout for pedestrians, other vehicles or any other obstacle in the vehicle's path."); *Zeller v. Durham*, 179 N.E.2d 34, 37 (Ill. App. Ct. 1962); 625 ILCS 5/11-1003.1 ("every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian"). So Lomec has established the first element, that is, Forero did owe a duty of ordinary care to Lomec.

Skipping to the third element, namely, proximate cause, the evidence does show, by a preponderance, that the collision caused Lomec's right foot injury. Lomec testified in his deposition that his right foot was injured in the accident. Lomec Dep. 31:1-23, 39:11-24. Lomec's medical records corroborate this. The medical records repeatedly reference Lomec having an ankle and foot injury in the days immediately following the accident. *E.g.*, Def.'s Exh. 11 at 25 (Hines VA – 000916; 12/17/09 Physician Emergency Dept E & M Note) (noting "Rt foot and ankle with ecchymosis[8] and scattered areas of thinly covered bullae[9] with serious fluid under

---

[8]Ecchymosis refers to discoloration of the skin from blood trapped below. *See* Oxford English Dictionary, available at http://www.oed.com (defining "ecchymosis" as "[a] blotch caused by extravasation of blood below the skin").

20

old areas covered by tape," … "swollen Rt and ankle with lateral foot deformity"); Def.'s Exh. 16 at 2 (Hines VA – 000328; 12/17/09 Radiology Reports) (noting "[m]oderate degree soft tissue swelling around the ankle region seen, especially so over the area of the lateral malleolus[10]"); Def.'s Exh. 17 at 4 (Hines VA – 000439; 12/19/09 Orthopedic Surgery Consult) ("A/P: 42 yo male with right foot and ankle pain, swelling, ecchymosis and likely fracture blisters … would limit weight bearing for now"); *id.* at 6 (Hines VA – 000441; 12/19/09 Surgery Consult) (noting "pt [patient] with recent history of trauma to RLE [right lower extremity] and that extremities showed "significant soft tissue swelling extending from distal anterior tibial to foot, echymosis [sic], some bullae"). The medical records also tie the injury to the car accident, because Lomec consistently reported the injury as caused by the collision. *E.g.*, Def.'s Exh. 11 at 1-2 (Hines VA – 000892-93; 12/17/09 Nursing Note) (discussing ankle and observing "[r]ight ankle with noted bruising and swelling from injury sustained Tuesday [Dec. 15, 2009]"); Def.'s Exh. 17 at 3 (Hines VA – 000438; 12/19/09 Orthopedic Surgery Consult) ("Pt presented to Mt Sinai after having his right foot run over by a car on Tuesday, 12/15/09. Pt told he had fractures, no splint applied"); Def.'s Exh. 20 at 8 (Hines VA – 000854; 12/19/09 Mental Health Resident Note) ("Patient fractured RLE about 4 days ago s/p motor vehicle collision."). To the extent the government is contesting whether the collision caused physical injury to Lomec, that argument is rejected. This evidence is

---

[9]Bulla (or the plural, bullae) refers to a bubble-like cavity filled with air or fluid. Oxford English Dictionary, available at http://www.oed.com (defining "bulla" as "[a] vesicle containing watery humour and causing an elevation of the skin").

[10]Malleolus refers to "[e]ither of the two bony protuberances on either side of the ankle." Oxford English Dictionary, available at http://www.oed.com (defining "malleolus").

sufficient to show that Lomec suffered an injury to his right foot and ankle, and that his injury was caused by the collision with Forero's car.

This then leaves the issue of breach of duty. Lomec asserts that Forero was negligent because he failed to see Lomec crossing the street, and thus breached his duty to look out for pedestrians and to avoid them. As explained in the Findings of Fact, Lomec was in the crosswalk at the time of the accident and *both* Forero *and* Lomec failed to be on the lookout for the other. Turning first to Forero's negligence, if Forero had been paying attention and keeping a proper lookout for pedestrians as he approached Lake and Francisco, as a reasonably prudent driver would have when approaching an intersection, then Forero would have seen Lomec. Because Forero did not, he was negligent.

This conclusion is bolstered by the fact that Lomec had the superior right-of-way at the time. In Illinois, a pedestrian in a crosswalk is considered to have the right-of-way, so cars must yield to the pedestrian. 625 ILCS 5/11-1002(a). By contrast, if a pedestrian is crossing outside of a crosswalk, then it is the pedestrian who must yield to the cars in the roadway. *Id.* 5/11-1003(a); *Palausky v. Landers*, 385 N.E.2d 751, 752 (Ill. App. Ct. 1978) ("pedestrian who is outside a crosswalk has the specific duty of yielding the right of way to oncoming traffic"). As noted earlier in the Opinion, Illinois law defines a "crosswalk" to cover both marked and unmarked crosswalks. A marked crosswalk is defined as "[a]ny portion of a roadway at an intersection or elsewhere distinctly indicated for pedestrian crossing by lines or other markings on the surface." 625 ILCS 5/1-113(b). There is no marked

crosswalk on Lake Street. There is, however, an unmarked crosswalk. An unmarked crosswalk is defined as "[t]hat part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway measured from the curbs or, in the absence of curbs, from the edges of the traversable roadway." *Id.* 5/1-113(a). The evidence shows, and it is undisputed, that both Lake Street and Francisco Avenue have sidewalks for pedestrians. Pl.'s Exh. 1 (photograph of intersection); Pl.'s Exh. 2 (same); Def.'s Exh. 7 (same). Those sidewalks run directly into the intersection. Pl.'s Exh. 1; Pl.'s Exh. 2. The curbs at all crossings are also lowered and there are warning domes (the raised bumps on the sidewalk) to alert pedestrians that they are approaching the intersection. Pl.'s Exh. 1; Def.'s Exh. 5, Five Photographs of Scene at 2. This evidence shows that a crosswalk, albeit an unmarked one, runs across Lake Street on the west side of the intersection. Lomec therefore had the superior right-of-way under Illinois law.

Because Lomec was using the crosswalk, Forero had a specific duty to yield to Lomec. 625 ILCS 5/11-1002 ("When traffic control signals are not in place or not in operation the driver of a vehicle shall stop and yield the right-of-way to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling … ."). When Forero approached the intersection and the crosswalk, Forero's "right to move forward was contingent upon the absence of a superior right-of-way in someone else." *Fox v. Calhoun*, 340 N.E.2d 125, 127 (Ill. App. Ct. 1975). In this case, someone else did have a superior right-of-way: Lomec, a pedestrian in the crosswalk. The fact that the crosswalk was

unmarked does not lessen the applicable duty of care. Either way, Forero was required to yield under Illinois law. *See Moran v. Gatz*, 62 N.E.2d 443, 481-82 (Ill. 1945) ("Regardless of the statute in question, … the driver of a vehicle on a city street … is charged with notice that pedestrians may cross the street over which he is driving," and he has a "duty" to drive his car so "as to enable him to avoid collision with other vehicles or pedestrians[.]"); *see also Pottei v. Demanes*, 87 N.E.2d 332, 332 (Ill. App. Ct. 1949) (only abstract published) (noting that "[m]otorist is charged with notice that pedestrians may cross streets and has duty to keep a lookout for them, particularly at intersections, irrespective of statute"). Because Forero failed to yield when Lomec was in the crosswalk, Forero breached his duty of care when he struck Lomec.

For its part, the government argues that Forero cannot be found negligent because Lomec needed more than just his deposition testimony to prove the claim. Citing to *Furry v. United States*, 712 F.3d 988 (7th Cir. 2013), the government asserts that Lomec was required to provide expert testimony (something he did not do) to show why his account of the accident is more accurate than another scenario in which Forero did not breach his duty of care. But this is not a case where expert reconstruction is necessary, and Lomec's case is distinguishable from *Furry*.

In *Furry*, the plaintiffs' car collided with a United States postal truck. 712 F.3d at 989-90. The plaintiffs sued the postal employee, alleging that he caused the accident by negligently pulling out of a parking spot. *Id.* at 989. The plaintiffs, however, admitted that they did not see the truck before the accident or observe the

collision, so they could only base their claim on the fact that they felt an impact. *Id.* at 990-91. The postal employee, who failed to appear at trial, testified in a prior deposition (and in contrast to the plaintiffs' testimony) that his truck was stationary at the time of the collision. *Id.* at 991. Although the district court credited the plaintiffs' testimony that their car collided with the truck, the court noted that because the plaintiffs did not see the truck or collision, their belief that the postal employee initiated the collision was merely speculative. *Id.* at 991-92. Because other scenarios were also plausible in which the postal employee did not breach his duty of care, the district court entered judgment for the postal employee. *Id.* at 992. On appeal, the Seventh Circuit affirmed, explaining that "[m]ere speculation" cannot prove breach and noting that plaintiffs "offered no expert testimony on accident reconstruction to explain why their account was likely more accurate than another scenario in which [the postal employee] did not breach his duty of ordinary care." *Id.* at 993.

But the Seventh Circuit did *not* hold in *Furry* that expert reconstruction is always necessary in order to prove breach of the duty of care, as the government seems to suggest. Rather, the Seventh Circuit explained that expert reconstruction is necessary when several plausible scenarios exist to explain how an accident occurred and the plaintiff can only *speculate* as to which is correct. That is not this case, however. Here, unlike in *Furry*, Lomec actually testified as to where he was when Forero struck him. And given the road and visibility conditions, Forero's concession that he did not see Lomec means that Forero was not paying enough

attention to satisfy the duty of ordinary care. So Lomec does not need to speculate as to which scenario most likely occurred (as the plaintiffs in *Furry* had to); he can and did testify about how the accident occurred based on his own first-hand observations, including that he was in the crosswalk. Lomec's account is actual, concrete testimony, and not just mere speculation.

The government also cites *Mulloy v. American Eagle Airlines, Inc.*, 832 N.E.2d 205 (Ill. App. Ct. 2005), in support of its argument here. But *Mulloy* is similarly distinguishable. There, a pedestrian working at an airport brought a negligence action against an airline and one of its employees. 832 N.E.2d at 206-07. The plaintiff sought damages for injuries he sustained when he was struck by a portion of a trailer attached to a vehicle driven by an airline employee. *Id.* The trial court entered a directed verdict in favor of the defense and the plaintiff appealed. On appeal, the Illinois Appellate Court affirmed, noting that Illinois law required the plaintiff to not only "present evidence … that [the airline employee] failed to avoid striking him, but also that the failure was unreasonable under the circumstances." *Id.* at 213. "Without evidence suggesting that [the airline employee] could have perceived a danger to [the plaintiff] and availed herself of reasonable steps to avoid it," the appellate court explained, "a verdict in [the plaintiff's] favor would have been inconsistent with the applicable standard of ordinary care and would, as the trial court suggested, have been the equivalent of the imposition of strict liability upon the defendant." *Id.* This, the appellate court stated, would have been improper. *Id.*

Unlike the airline employee in *Mulloy*, however, Forero could easily have anticipated that a pedestrian would be crossing the street at an intersection, and could have also slowed down to properly ensure that no pedestrians or other dangers were present. Indeed, he had a duty to do just that. 625 ILCS 5/11-1002 (when a pedestrian is in a crosswalk, "the driver of a vehicle *shall stop* and yield the right-of-way to a pedestrian" (emphasis added)). His failure to maintain a proper lookout and to yield to pedestrians constitutes negligence. No additional evidence or expert testimony is required to show that Forero "could have perceived a danger" and "availed [himself] of reasonable steps to avoid it." *Mulloy*, 832 N.E.2d at 213. Lomec was struck by a moving vehicle, not by some attachment to a trailer that could have become detached for any number of reasons. Lomec was not required to provide any expert testimony to prevail on his claim.

This then leaves the issue of Lomec's own negligence. The government argues that Lomec was negligent because he failed to exercise reasonable care for his own safety when crossing Lake Street. As discussed in the Findings of Fact, there is evidence in the record to support the government's contention. As an initial matter, neither party disputes that pedestrians have a duty to conduct themselves in a manner that is "free from contributory negligence." *Zeller*, 179 N.E.2d at 37; *see also Albaugh v. Cooley*, 429 N.E.2d 837, 840 (Ill. 1981); *Patel v. Brown Mach. Co.*, 637 N.E.2d 491, 500 (Ill. App. Ct. 1994). And even though Lomec was crossing in a crosswalk, which gave him the superior right-of-way, that fact does not automatically absolve him of his own responsibility to exercise care. *See Moran v.*

*Gatz*, 62 N.E.2d 443, 485-86 (Ill. 1945). Even when crossing in a crosswalk, a pedestrian must still exercise due care for his own safety. *Albaugh*, 429 N.E.2d at 840; *Malpica v. Sebastian*, 425 N.E.2d 1029, 1031 (Ill. App. Ct. 1981); *Klimovich v. Crutcher*, 206 N.E.2d 723, 726 (Ill. App. Ct. 1965); *Sheehan v. United States*, 2003 WL 21938610, at *13 (N.D. Ill. Aug. 11, 2003). Indeed, under Illinois law, a pedestrian has a duty not to "suddenly leave a curb or other place of safety and walk or run into the path of a moving vehicle which is so close as to constitute an immediate hazard." 625 ILCS 5/11-1002(b).

Here, Lomec states that he looked both ways before entering the intersection, but that he did not see any cars. Lomec Dep. 27:24-25, 28:1-9, 30:18-23. As discussed earlier, this testimony is not plausible. If Lomec had looked for oncoming traffic as he claims, then he would have seen Forero's car (just as Forero would have seen him), even if in the distance. With Forero going only 15 to 20 miles-per-hour, there is no way Forero could have snuck up on Lomec. Had he looked, Lomec would have seen Forero's car approaching. *See Greenwald v. Balt. & O.R. Co.*, 164 N.E. 142, 144 (Ill. 1928) ("the law will not tolerate the absurdity of allowing a person to testify that he looked but did not see [what was there to be seen]"). The fact that Lomec failed to observe Forero's car until the time of the collision means Lomec did not look for oncoming traffic before entering the intersection and did not exercise reasonable care for his own safety. The Court concludes that Lomec's negligence renders him fifty percent (50%) responsible for this collision—both sides are equally responsible for the accident.

The government points to other pieces of evidence, which it argues demonstrates that Lomec was both negligent and at greater fault for the accident than Forero. But none of this evidence persuades the Court that Lomec was any more than fifty percent at fault. First, the government points to Lomec's medical records, and in particular, those records discussing his mental health status around the time of the accident and his prior drug use. The government contends that these records show that Lomec could not have been in a proper state of mind at the time of the accident, and therefore, could not have exercised reasonable care when crossing the street. It is true that Lomec was admitted to Hines VA Hospital in the days after the accident for suicidal ideations, which does suggest that Lomec was dealing with some mental health problems around the time of the accident. *E.g.*, Def.'s Exh. 10 at 1 (Hines VA – 000922; 12/17/09 Mental Health Nursing Note) ("[Patient] came to Hines VA due to having suicide ideations with plan of overdosing on drugs."); Def.'s Exh. 15 at 6 (Hines VA – 000860; 12/18/09 Student Note). But there is no direct evidence that Lomec had suicidal ideations on the day of the accident, or that he wanted to commit suicide-by-traffic on that day; none of the records produced show that Lomec was considering suicide on the day of the accident, they only refer to the days following the accident. The government further notes that Lomec's mental health care providers noted just a few days after the accident that Lomec was depressed, "easily distracted" and exercising "[p]oor judgment." *E.g.*, Def.'s Exh. 10 at 1-2 (Hines VA – 000922-923; 12/17/09 Mental Health Nursing Note); Def.'s Exh. 14 at 1 (Hines VA – 000887; 12/17/09 H & P

Note); Def.'s Exh. 20 at 6-7 (Hines VA – 000852-853; 12/19/09 Social Work Initial Evaluation Note). But the government fails to elaborate on this, or to shed any light on what these terms might mean—concretely—in the context of mental health conditions or how they might relate to Lomec's state of mind on the day of the accident. What's more, Forero testified that he and Lomec had a polite and amicable conversation after the collision, where Forero did not detect any mental health instability in Lomec. Trial Tr. (Morning) 67:2-68:13. Lomec also testified that after the collision he told Forero, "I am happy that I am alive. Thank you for not killing me." Lomec Dep. 34:19-25. If Lomec had been considering suicide or in a severely depressed state of mind at the time of the accident, then he probably would not have had an amicable conversation right after the collision. These mental health records do not prove anything important.

A similar problem arises with Lomec's drug-use records. To be sure, it is undisputed that there were detectable traces of cocaine and opiates in Lomec's system two days after the accident. Def.'s Exh. 12, 12/17/09 Drug Test Results. It is also undisputed that Lomec's medical records show that he had relapsed around the time of the accident, and that he was taking cocaine three to four times a week. Def.'s Exh. 15 at 2 (Hines VA – 000856; 12/18/09 Mental Health Treatment Plan Note); Def.'s Exh. 20 at 2 (Hines VA – 000848; 12/19/09 Social Work Initial Evaluation Note). But once again, there is nothing in Lomec's medical records (or anything else) to tie Lomec's drug use to the day of the accident, which is the relevant time frame here. And in fact, both Lomec and Forero testified that Lomec

was *not* under the influence of drugs or alcohol at the time of the accident. Lomec explicitly stated this in his deposition, Lomec Dep. 32:14-25, and Forero testified that he did not believe Lomec was intoxicated or impaired in any way at the time of the accident. Trial Tr. (Morning) 68:10-13. Forero also estimated that, during his tenure with the Chicago Police Department, he probably filled out 50 to 100 traffic reports and interacted with individuals under the influence of drugs or alcohol at least 10 to 50 times. *Id.* 28:24-29:5, 32:2-6. If Lomec was impaired on the day of the accident, as the government asserts, then presumably Forero—a trained police officer and F.B.I. agent—would have noticed. Lomec's drug use is not important in this case.

As a final note, two other pieces of evidence offered by the government do not alter the conclusion of negligence against both parties. At trial, Agent Sam testified that he spoke with Lomec over the phone the day after the accident. Trial Tr. (Afternoon) 145:7-10, 146:11-12. Sam testified that he shared everything he learned on that call with Forero, including that Lomec said, "he [Lomec] obviously wasn't looking *either* when it (accident) happened." Def.'s Exh. 3, 12/16/09 F.B.I. Report at 2 (emphasis added); Trial Tr. (Afternoon) 146:14-16. Although this information suggests that Lomec believed he *too* was at fault for the accident—something the Court has already found—this evidence does not show that Lomec was any more responsible for the accident than Forero was. The same is true of Forero's handwritten note. After the accident, when speaking with Lomec, Forero jotted down some notes on a piece of paper. Def.'s Exh. 6, Forero Handwritten Note.

Forero later updated his notes on that paper to reflect that Lomec told him that he "wasn't going to sue/hoped I [Forero] would not sue him." *Id.* Again, this evidence suggests that Lomec knew he was partially at fault for the accident, but does not prove anything else.

After considering the evidence presented at trial, the Court finds that Forero and Lomec were equally at fault for causing the accident. If Forero had been paying attention as he was approaching the intersection that day, like a reasonable driver would have been, then he would have seen Lomec in the crosswalk. Likewise, if Lomec had checked for oncoming traffic before entering the crosswalk, as he should have, then he would have seen Forero's car approaching. Both parties are equally responsible for this accident.[11]

## III. Conclusion

For the reasons discussed, the Court finds that both Forero and Lomec were negligent and each was fifty-percent (50%) at fault for causing the accident. In view of this decision, the parties must discuss how they wish to proceed on the damages

---

[11]It is worth noting that Forero did do a lot of things the right way *after* the accident. Among other things, he stopped immediately after the collision, he reported the accident at the local police station, and he avoided any hint of trying to intimidate Lomec with his employment as an F.B.I. agent. And none of the credibility decisions in this Opinion are based on any suggestion that Forero has intentionally or recklessly misstated any fact; instead, as explained in the Opinion, there are honest differences of factual opinion arising out of the circumstances.

portion of this lawsuit. The Court also encourages the parties to engage in serious settlement negotiations now that liability has been established.

ENTERED:


_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: August 23, 2016